THOMAS L. NORRIS, JR., ADMINISTRATOR OF THE ESTATE OF MARSHALL
PARKER; SUSAN W. HARTSOG, EXECUTRIX OF THE ESTATE OF RALPH
HARTSOG; NANCY M. JOHNSON, ADMINISTRATRIX OF THE ESTATE OF
CAROL K. JOHNSON; JUDITY M. MACHADO, ADMINISTRATRIX OF THE
ESTATE OF JOSE R. MACHADO v. INSURANCE COMPANY OF NORTH
AMERICA

No. 7418SC1059

(Filed 4 June 1975)

1. Insurance §§ 4, 63— aircraft insurance — binder

There was ample evidence to support a jury finding that a legally
effective binder for aircraft insurance was in existence on the date the
aircraft crashed where it tended to show that the treasurer of the
corporate lessee of the aircraft called an agent authorized to bind de-
fendant insurer and told him to bind coverage effective on a date
some three weeks prior to the crash, the agent in turn instructed de-
fendant insurer to bind coverage as of that date, the particular type
and amount of coverage had been discussed previously between officials
of the lessee and the agent and between the agent and defendant in-
surer's underwriter, and the underwriter went forward with prepara-
tion of the policy on a form customarily used by defendant insurer for
writing aircraft insurance policies and mailed this to the agent even
before receiving the signed application for the insurance.

2. Insurance §§ 4, 63— aircraft insurance — binder — terms

Where there is no standard form of aircraft insurance prescribed
by statute, and in the absence of an express agreement to the contrary,
the terms and provisions of a binder or temporary contract of aircraft
insurance are those of the policy ordinarily used by the insurance com-
pany to cover similar risks.

3. Insurance §§ 4, 63— aircraft insurance — binder — delivery of aircraft

Delivery of an airplane on the exact date the parties to an insur-
ance contract expected delivery to occur was not a condition precedent
to the effectiveness of a binder for insurance on the airplane, but the
binder became effective on the date of actual delivery, and the evidence
was sufficient to support a jury finding of delivery where it tended
to show that the pilot of the purchaser's lessee flew the airplane away
from the seller's premises with all equipment called for in the purchase
order installed in the airplane and with no restrictions placed by the
seller upon use of the airplane.

4. Insurance § 63— aircraft insurance — admitted liability coverage —
meeting of the minds

The jury could find that there was a meeting of the minds of the
parties before an airplane crash that the amount of the admitted lia-
bility coverage for the airplane was to be $100,000 per seat where
there was evidence tending to show that, although an employee of an
agent representing defendant insurer told defendant's underwriter by
telephone that the admitted liability coverage should be $50,000 per seat

Norris v. Insurance Co.

and the policy mailed by the underwriter before he received the written application showed that amount, the agent at all times had a clear understanding with officials of the prospective insured that the coverage was to be $100,000 per seat, the application prepared by the agent showed $100,000 per seat coverage, as soon as the agent received the written policy three days before the airplane crashed he notified defendant of the mistake in the amount of the admitted liability coverage shown on the policy, and on the day of the crash defendant's underwriter confirmed to the agent there was no problem as to the amount of coverage and that "you have got the $100,000."

5. **Insurance § 63— aircraft liability insurance — insurable interest — ownership**

Declaration in an aircraft insurance policy that the named insured is the sole owner of the aircraft applied only to insurance against physical damage to the aircraft itself, and ownership was not necessary to the establishment of an insurable interest in the aircraft for purposes of liability insurance coverage.

6. **Insurance § 63— aircraft liability insurance — ownership — absence of bill of sale, registration with F.A.A. — delivery**

Even if ownership of an aircraft by the named insureds was a condition of liability insurance coverage on the aircraft, execution of a bill of sale by the seller, recordation of ownership with the Federal Aviation Agency as provided for in 49 U.S.C. § 1403(a), and registration of the aircraft pursuant to 49 U.S.C. § 1401 were not essential to a transfer of ownership, and the evidence was sufficient to support a jury finding that insureds, the purchaser and lessee, had become owners of the aircraft under G.S. 25-2-401(2) where it tended to show that the seller had fully completed all work called for in the purchase order and that it unconditionally delivered the aircraft to the lessee's pilot who flew it away from the seller's premises.

7. **Insurance § 63— aircraft insurance — substitute aircraft**

The evidence was sufficient to support a jury finding that an airplane was being temporarily used as a "Substitute Aircraft" within the meaning of an aircraft liability policy at the time it crashed where it tended to show that the airplane was furnished by the seller of the insured airplane for use by insureds, it was "another fixed wing aircraft" of the type to meet policy requirements for a "Substitute Aircraft," the airplane described in the policy had been placed in normal use by the insureds in that it had been used to transport an employee of the insured lessee, and the insured airplane had been "withdrawn from normal use" because of its "repair" or "servicing" in that it had been returned to the seller so that a radio master switch could be installed and a circuit altered to allow use of a different type of boom mike than that for which it was originally designed; the fact that insureds had been notified on the day before the substitute airplane crashed that the repairs and servicing of the insured airplane had been completed does not require a finding that the insured plane was, as of the moment of such notification, no longer "withdrawn from normal use" since insureds had a reasonable time after such notification to pick up the insured airplane and the airplane they were using in its

Norris v. Insurance Co.

place was still being "temporarily used as a substitute for such aircraft" during that time.

APPEAL by plaintiffs from *Wood, Judge.* Judgment entered 18 July 1974 in Superior Court, GUILFORD County. Heard in the Court of Appeals 11 March 1975.

Civil action to recover $400,000.00 under a contract of insurance, Policy No. ANM 17 97 05.

On 13 December 1971 a Beech Baron Aircraft, Federal Aviation Certificate No. N4877J, crashed near Douglas Airport, Charlotte, N. C. Plaintiffs' intestates, Marshall Parker, Ralph Hartsog, Carol K. Johnson and Jose R. Machado, all employees of Knit-Away, Inc., were killed in the crash. The aircraft which crashed, No. N4877J, belonged to Air Service, Inc., and was not the aircraft described in the policy. Plaintiffs alleged that it was loaned to Knit-Away by Air Service while final repairs and servicing were made to the new Beech Baron Aircraft No. N9280Q, the aircraft identified in the insurance policy, and plaintiffs contend that the crashed aircraft was a "substitute aircraft" under the following language of paragraph 10 of the policy:

"10. *Temporary Use of Substitute Aircraft.*

While the aircraft described in this policy is withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction, such insurance as is afforded under Coverages D, E, F, G and H of this policy with respect to such aircraft applies with respect to another fixed wing aircraft, certificated by the Federal Aviation Agency and of no greater seating capacity, not owned by the named insured, while temporarily used as the substitute for such aircraft."

Coverage G of the policy provided that the insurance company should pay on behalf of the insured all sums which the insured shall become liable to pay as damages because of bodily injury, including death resulting therefrom, sustained by any person and arising out of the ownership, maintenance or use of the aircraft as described in the policy. The policy contained an "Admitted Liability Endorsement" by which the defendant insurance company (INA) and the named insured agreed that INA's limit of liability under Coverage G for each person shall be offered in payment by INA in full settlement of any claim be-

cause of bodily injury resulting in loss of life sustained by a passenger carried in an insured aircraft whether or not the insured is legally liable in respect of such claim. In substance, the effect of the Admitted Liability Endorsement is that the estate of a passenger who is killed in an insured aircraft may elect to accept a specified amount as death benefits under the policy in lieu of prosecuting a wrongful death claim based on negligence. Plaintiffs have made such an election in this case, and consequently this action is based on the contract contained in the policy.

The policy named Knit-Away as the named insured in the "Declarations" and by endorsement named Richard Bruce as an additional insured "as respects his liability as lessor." Plaintiffs seek recovery from defendant INA under the policy and particularly under the Admitted Liability Endorsement thereto in the sum of $100,000.00 for each plaintiff.

INA filed answer to which it denied liability and alleged that the policy sued on was not delivered to any insured thereunder at the time of the accident, that it was not countersigned and otherwise issued as required by the terms of the policy and the application therefor, that Knit-Away did not have an insurable interest in the aircraft described in the policy, and that the policy was not in effect on 13 December 1971. INA also contends that if the policy was in effect, it did not insure the airplane which crashed on 13 December 1971.

Plaintiffs' evidence showed: In early October 1971, officials of Knit-Away, a textile manufacturing company, negotiated with Air Service, an airplane selling and servicing company located at Greensboro, for the purchase of a new aircraft. As result of these negotiations, Richard P. Bruce, the President of Knit-Away, signed a purchase order dated 14 October 1971 by which he agreed as an individual to purchase from Air Service a new Beechcraft Airplane, Model 58 Baron, No. N9280Q. The purchase price of the airplane, with additional specified optional equipment to be installed, was $116,650.00. Bruce gave Air Service his personal check for $5,000.00 to cover the deposit required by the purchase order and agreed to pay the balance of $111,650.00 in cash. At the time the purchase order was signed, aircraft No. N9280Q was registered to Air Service and was in its possession at Greensboro, where it remained while Air Service was engaged in installing in it the additional optional equipment specified in the purchase order.

On 24 November 1971 Bruce, as lessor, and Knit-Away, as lessee, entered into a written lease agreement by which Bruce leased the new aircraft to Knit-Away for a term of 36 months commencing on 24 November 1971. The lease provided that the lessee should keep the leased aircraft insured during the term of the lease against liability for bodily injury and property damage and that the insurance policy or policies should name the lessee and lessor as insured. Prior to 24 November 1971 officials of Knit-Away had conferred with Murray M. White, Jr., an insurance agent and broker and President of Murray M. White, Incorporated, of High Point, and had obtained from him quotations for insurance coverage on the aircraft. White represented INA as an independent agent and had authority to bind INA and to write policies on risks that INA found acceptable. After talking with Knit-Away officials about the coverage on the aircraft, White talked with Paul Chapoton, a Marine and Aviation Underwriter employed by INA. On 26 October 1971 Chapoton wrote a letter to White in which he confirmed a quotation of rates for various coverages on the aircraft, including a quotation of rates for admitted liability coverage. This letter stated that the quotation given was "based upon Mr. Bruce purchasing the aircraft, and then leasing it to his company." Just prior to 22 November 1971, Tom Foreman, the Treasurer of Knit-Away, called White and told him that they were going to accept delivery of the aircraft on 24 November and asked White to bind coverage on that date. White wrote INA and told them to bind coverage as of 24 November. On 6 December 1971 White forwarded the application for the policy to INA and asked them to go ahead and issue the policy in accordance with the enclosed application. The application was signed by Marshall Parker, pilot for Knit-Away, was dated 2 December 1971, requested insurance from 24 November 1971 to 24 November 1972, and applied for $5,000,000.00 single limit coverage, passengers included, and for $100,000.00 per seat guest voluntary settlement or admitted liability coverage.

On 10 December 1971 White received from INA policy ANM 17 97 05, a copy of which was introduced in evidence. This shows a policy period from 24 November 1971 to 24 November 1972 and describes the covered aircraft as a 1972 Beech Baron, Federal Aviation Agency Certificate No. N9580Q. (In a final pretrial order all parties stipulated that the reference in the policy should have been to No. N9280Q and that the reference in the policy is changed to so indicate for the purposes of this

trial.) The parties stipulated that on or about 1 December 1971 Brenda Coggins, an employee of Murray M. White, Inc., told Paul Chapoton of INA in a telephone conversation that the admitted liability endorsement in the policy should be $50,000.00 per seat, that the policy was forwarded to Murray White, Inc., on 7 or 8 December 1971, and that the application and the policy apparently crossed in the mails. The policy shows $50,000.00 per seat admitted liability insurance. When White received the policy on 10 December 1971 he phoned INA and told them that the policy was "written incorrectly because the admitted limits should have been $100,000.00 as per the application." White testified that he talked with Chapoton again on Monday, 13 December 1971, the date of the crash, and reminded him of the telephone call on Friday, 10 December, and of the fact that the admitted liability endorsement was incorrect in the policy and that $100,000.00 per seat admitted liability coverage had been ordered, to which Chapoton responded: "No problem; you have got the $100,000.00."

After the crash White billed Knit-Away for $2,951.00 as the premium for the insurance coverage, and Knit-Away paid White that amount. This premium was based on $100,000.00 per seat admitted liability coverage. White in turn accounted to INA for the $2,951.00 he collected from Knit-Away, less his 15 percent commission. In June 1973 INA tendered repayment to Knit-Away of $2,462.00, the amount of the premium shown in the policy, which premium was based on admitted liability coverage of $50,000.00 per seat. Knit-Away refused to accept the repayment tendered by INA.

After Bruce signed the purchase order dated 14 October 1971 for purchase of the new plane, No. N9280Q, from Air Service, Air Service proceeded with the work of installing in the plane the additional equipment called for in the purchase order. Air Service promised delivery of the plane on 5 November 1971, but fell behind schedule because of problems in getting equipment. As a result, the promised delivery date slipped to 24 November 1971. On that date the work was still not completed. On Monday, 6 December 1971, Marshall Parker, the pilot for Knit-Away, and Richard Austin, the sales representative for Air Service, jointly flew the new plane. At that time all of the equipment was on the airplane and in working order. On the afternoon of 7 December 1971 Parker left Greensboro in the new airplane, N9280Q. In this regard Austin testified:

"I made no restrictions on his use of the aircraft at the time he left on December 7th. The equipment as per the list was installed and there were no restrictions as to his use."

On Thursday morning, 9 December 1971, the new aircraft, N9280Q, was back on the ramp of Air Service. On the following day, 10 December 1971, employees of Air Service installed in the new plane a radio master switch and modified a circuit so that a boom mike of a different type than they had wired for would be operable. The radio master switch was not a part of the original order. The wiring for the boom mike was, but it did not work with Parker's personal microphone. This work was accomplished on Friday, 10 December 1971. On Sunday, 12 December 1971, Austin, the sales representative of Air Service, test flew the new plane, N9280Q, for the purpose of checking it following the installation of the master relay and master radio switch. Following this test flight, Austin telephoned Marshall Parker and told him the plane was acceptable if he wanted to use it. On Monday, 13 December 1971, the date that aircraft N4877J crashed near Charlotte, the new aircraft, N9280Q, was still sitting on the ramp of Air Service at Greensboro. The only time between 9 and 13 December 1971 when N9280Q left the premises of Air Service was when Austin test flew it.

The airplane which crashed, N4877J, had been loaned by Air Service to Knit-Away around the last of November 1971, when Air Service delivered that plane to Marshall Parker at Raleigh. Parker had permission of Air Service to use N4877J until the new plane was ready. Plane N4877J was on the premises of Air Service on Tuesday, 7 December, and Wednesday, 8 December 1971. It was not there on 10 December 1971. Austin had obtained permission from the President of Air Service for Marshall Parker to fly the plane, N4877J, while Air Service was installing the radio master relay or speaker relay in the new plane. The airplane, N4877J, crashed at Charlotte at 9:00 a.m. on 13 December 1971.

Other evidence will be referred to in the opinion.

At the close of plaintiffs' evidence, the court allowed the defendant's motion under Rule 50 for a directed verdict and dismissed plaintiffs' action.

*Poyner, Geraghty, Hartsfield & Townsend, by Marvin D. Musselwhite, Jr., John L. Shaw and Cecil W. Harrison, Jr.; and W. Pinkney Herbert, Jr., P.A. by W. Pinkney Herbert, Jr., and J. Michael Booe, for plaintiff appellants.*

*Hudson, Petree, Stockton, Stockton & Robinson, by W. F. Maready and Robert J. Lawing, for defendant appellee.*

PARKER, Judge.

The sole question brought forward on this appeal is whether the court erred in granting defendant's motion for a directed verdict. Plaintiffs contend that their evidence, when taken as true and when considered in the light most favorable to them, was sufficient to require submission of this case to the jury. We agree.

Defendant contends the directed verdict in its favor was properly entered on the grounds, first, that plaintiffs' evidence was insufficient to show any contract of insurance was in effect at the time of the accident, and, second, if plaintiffs' evidence was sufficient to show the insurance was in effect, it did not insure the airplane which crashed. We first examine the contention that plaintiffs' evidence was insufficient to show a valid contract of insurance was in effect at the time of the accident.

The written policy, which bore the designation "Aircraft Policy ANM 17 97 05," was on a printed form of defendant INA. The printed attestation clause which immediately precedes the facsimile signatures of the President and of the Secretary-Treasurer is as follows: "In Witness Whereof, the company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the declarations page by a duly authorized agent of the company." No countersignature of any authorized agent appears on the declarations page of the printed policy. There was evidence that Murray M. White was an authorized agent of INA and that the policy was in his possession when the fatal crash occurred on 13 December 1971. White testified that he forwarded the policy to Knit-Away on 7 January 1972 with a covering letter which bore his authorized signature, that the policy was not signed by him "through oversight," and that it was his "intention to forward a signed insurance policy." There is authority to the effect that "as countersigning is an evidence of delivery, it seems that a delivery by letter would be sufficient." 1 Couch, Insurance 2d, § 8:17, p. 367.

There is also authority that "when the countersignature though made is delayed, the insurer is liable for the loss sustained prior to countersignature," 1 Couch, Insurance 2d, § 8:14, p. 365; Annot., 22 A.L.R. 2d 984, 987 (1952); see *Pruitt v. Insurance Co.*, 241 N.C. 725, 86 S.E. 2d 401 (1955). We do not, however, base our decision here upon a determination that the policy, as a completed document, was effective as of the date of the crash. In our opinion there was ample evidence to support a jury finding that a legally effective "binder" for the insurance was in existence on that date.

[1, 2] "In insurance parlance, a 'binder' is insurer's bare acknowledgment of its contract to protect the insured against casualty of a specified kind until a formal policy can be issued, or until insurer gives notice of its election to terminate. The binder may be oral or in writing." *Moore v. Electric Co.*, 264 N.C. 667, 673, 142 S.E. 2d 659, 664 (1965). Here, there was evidence that on 22 November 1971 the Treasurer of Knit-Away called Murray White, who was an agent authorized to bind the defendant, INA, and told him to bind coverage effective 24 November 1971. There was evidence that White in turn instructed INA to bind coverage as of that date. There was also evidence that the particular type and amount of coverage had been discussed previously between officials of Knit-Away and White and between White and Chapoton, the underwriter employed by INA. That Chapoton considered the coverage bound is shown by the fact that he went forward with the preparation of the policy on the INA form customarily used by it for writing policies of aircraft insurance and that he mailed this to White even before receiving the signed application. We hold the evidence sufficient to support a jury finding that a legally effective "binder" or temporary contract of insurance was in effect when the fatal crash occurred. Where, as here, there is no standard form of aircraft insurance prescribed by statute, and in the absence of an express agreement to the contrary, the terms and provisions of such temporary contract of insurance are those of the policy ordinarily used by the insurance company to cover similar risks. 43 Am. Jur. 2d, Insurance, § 219, p. 280. This was the form sent by Chapoton to White and which, after the crash, White forwarded to Knit-Away. Even though not countersigned "on the declarations page," it was competent in evidence to show the terms and provisions of the temporary contract of insurance or "binder."

[3] Defendant contends that any binder for insurance was conditioned upon Knit-Away accepting delivery of the insured aircraft on 24 November 1971, that the evidence shows that it did not accept delivery on that date or at any time thereafter, and that for these reasons no binder became effective. We do not agree. While the aircraft was not delivered on 24 November 1971, there was evidence from which the jury could find that it was unconditionally delivered by the seller, Air Service, and accepted by Knit-Away on 7 December 1971. On that date the pilot for Knit-Away flew the plane away from the seller's premises at Greensboro with all equipment called for in the purchase order installed in the plane and with no restrictions placed upon his use of the aircraft by the seller. From this the jury could find that a final unconditional delivery of the plane had been made by the seller and accepted by Knit-Away, the lessee from the purchaser, at least as of 7 December 1971. We find nothing in the conduct of the parties as shown by the evidence in the record before us to support defendant's contention that any insurance binder could become effective, if at all, only on condition that delivery of the plane be accepted by Knit-Away exactly on 24 November 1971. On the contrary, the more reasonable interpretation of the conduct of the parties is that the prospective insureds, Bruce as owner and Knit-Away as lessee, wanted insurance coverage, and INA agreed to provide such coverage, from the instant the plane was delivered by the seller, and that although all parties expected this to occur on 24 November 1971, they were not making delivery as of that exact date a condition precedent to any binder for insurance ever becoming effective.

[4] Defendant contends that the binder was not effective because there was no meeting of the minds of the parties as to the amount of the admitted liability coverage. In this connection the parties stipulated that on or about 1 December 1971 Brenda Coggins, an employee of Murray M. White, Inc., told Chapoton of INA in a telephone conversation that the amount of the admitted liability coverage should be $50,000.00 per seat. The policy No. ANM 17 97 05 as prepared and mailed by Chapoton before he received the written application showed that amount. There was ample evidence, however, that White, an authorized agent representing INA, at all times had a clear understanding with the officials of Knit-Away that the coverage was to be in the amount of $100,000.00 per seat, and the application dated 2 December 1971 which was prepared by White, agent for INA,

and signed by Parker, agent for Knit-Away, showed $100,000.00 per seat coverage. White had authority to bind INA, and all of the evidence shows that he and the officials of the insured, Knit-Away, were in complete agreement as to the amount of the coverage. In addition, White testified that as soon as he received the written policy on 10 December 1971, three days before the crash, he notified INA of the mistake in the amount of the admitted liability coverage shown in the policy and on the day of the crash Chapoton confirmed to him there was "no problem" as to the amount of coverage and that "you have got the $100,000.00." Viewing the evidence in the light most favorable to the plaintiffs, as we are bound to do in reviewing the trial judge's order which granted defendant's motion for a directed verdict, it is clear that the jury could legitimately find from the evidence that there was a meeting of the minds of the parties before the crash that the amount of the admitted liability coverage was to be $100,000.00 per seat.

[5] Finally defendant contends there was no valid contract of insurance in effect because the named insureds, Bruce and Knit-Away, did not have an insurable interest in the aircraft identified in the policy, No. N9280Q, at the time of the crash. In support of this contention defendant points to the evidence that no bill of sale for the aircraft was executed by the seller, Air Service, and the aircraft was never registered in the name of Bruce or Knit-Away with the Federal Aviation Agency. However, in the present case we are concerned only with liability insurance coverage, and "[t]he insurable interest in such cases is to be found in the interest that the insured has in the safety of those persons who may maintain, or the freedom from damage to property which may become the basis of, suits against him in case of their injury or destruction." 3 Couch, Insurance 2d, § 24:159, p. 273; Annot., 1 A.L.R. 3d 1193 (1965). Thus, "[a]n insurable interest in the property covered by liability insurance is usually not required, in the same sense as in property insurance, since the risk insured against is not based on ownership of property, but upon loss and injury caused by its use for which the insured might be liable." 7 Appleman, Insurance Law and Practice, § 4253, p. 11. In general, therefore, the trend of modern court decisions is to hold that for purposes of vehicular liability insurance "no legal or equitable interest in the insured vehicle *as property* is necessary, but it is enough that the insured may be held liable for damages incident to its operation and use." Annot., 1 A.L.R. 3d 1193, § 3, p. 1197 (1965).

Defendant points to the following language in Item 8 of the Declarations of Policy No. ANM 17 97 05:

"Item 8. (a) Except with respect to bailment, lease, conditional sale, mortgages, or other encumbrance the named insured is the sole owner of the aircraft; . . ."

immediately below which appears:

"Exception, if any, to (a) or (b) *none.*"

Defendant contends this language in the Declarations imposes a contractual requirement that ownership of the aircraft must be vested in the insureds as a condition precedent to imposing any liability upon the insurer, citing *Younts v. Insurance Co.,* 281 N.C. 582, 189 S.E. 2d 137 (1972). That case is distinguishable. In *Younts,* which involved an automobile liability policy, the policy provided that the insurance company should pay on behalf of the insured all sums which the insured should become legally obligated to pay arising out of the ownership, maintenance or use of the *"owned* automobile." 281 N.C. at 585. Stressing this provision, our Supreme Court held that the policy in that case was a contract between the insurance company and the owner of the vehicle involved and that since the person against whom plaintiff had obtained judgment was not the owner, plaintiff could not recover from the insurance company. In the policy before us in the present case, the defendant insurance company agreed to pay under Coverage G of the policy all sums which the insured should become legally obligated to pay arising out of the ownership, maintenance or use of the aircraft *"as described in this policy."* (Emphasis added.) Thus, the language in which the effective insuring agreement is expressed in the policy before us does not limit the agreement to one between the insurer on the one hand and the owner of the vehicle insured on the other, at least insofar as the liability insurance provided by Coverage G is concerned. In our opinion Item 8 (a) of the Declarations quoted above is relevant to the insurance provided by Coverages A, B and C in the policy, which provided insurance against physical damage to the insured plane itself. For that type of coverage, ownership of the insured property is relevant to show an insurable interest. For the reasons stated above, ownership is not as relevant to establish an insurable interest in the case of liability insurance coverage.

[6]   Furthermore, if it be conceded *arguendo* that ownership in the named insureds of the aircraft described in the policy

Norris v. Insurance Co.

was a condition to any obligation on the part of defendant insurance company even insofar as liability insurance coverage is concerned, there was in this case sufficient evidence from which the jury could find that the insureds, Bruce as lessor and Knit-Away as lessee, had become the owners of the aircraft described in the policy at the time the crash occurred. As above noted, there was evidence that by 7 December 1971 the seller, Air Service, had fully completed all work called for in the purchase order and that on that date it unconditionally delivered the plane to Knit-Away's pilot, who then took the plane and flew it away from the seller's premises. G.S. 25-2-401 (2) contains the following:

> " (2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place. . . ."

Execution of a bill of sale by the seller and recordation of ownership with the Federal Aviation Agency as provided for in Title 49 U.S.C. § 1403 (a) was not essential to transfer of ownership. *See* Annot., 22 A.L.R. 3d 1270 (1968). Subsection (c) of 49 U.S.C. § 1403 expressly provides that "[n]o conveyance or instrument the recording of which is provided for by subsection (a) of this section shall be valid in respect of such aircraft . . . against any person other than the person by whom the conveyance or other instrument is made or given, his heir or devisee, or any person having actual notice thereof. . . ." The clear implication of this language is that the conveyance, even though not recorded, is valid as against the person making the conveyance and against any person having actual notice thereof. Moreover, although 49 U.S.C. § 1403 is controlling over state laws as to the manner in which recordation of conveyances and encumbrances on aircraft are to be made, state law is to be applied in determining the inherent validity of such conveyances and encumbrances. *See* cases cited in Annot., 22 A.L.R. 3d 1270, § 4, p. 1277, *et seq.* In this State a bill of sale or other document is not necessary to transfer of title to personal property, at least absent some statute, such as our motor vehicle law, applicable to the particular type of property involved. We have no statute applicable particularly to aircraft, and we find G.S. 25-2-401 (2) above cited, which is applicable to sales of "goods" generally, to be here controlling.

Defendant's argument that the insureds, Bruce and Knit-Away, were not the owners of the aircraft described in the policy because it was not "registered" in the name of either as required by 49 U.S.C. § 1401 is not persuasive. Subsection (f) of § 1401 expressly provides that "[r]egistration shall not be evidence of ownership of aircraft in any proceeding in which such ownership by a particular person is, or may be, in issue." Moreover, whether the purchased aircraft could, or could not, be lawfully operated prior to its registration by its owner as provided in Title 49 U.S.C. § 1401(a) simply has no bearing on the question of defendant's liability under its contract of insurance. Nothing in that contract, as evidenced by the Policy ANM 17 97 05, excludes liability on the part of the insurer for any unlawful operation by reason of failure to comply with the registration requirements of 49 U.S.C. § 1401. Additionally, we point out that the newly purchased plane was not the plane which crashed and was not being then operated.

Evidence that following the crash Bruce, the purchaser, agreed with Air Service, the seller, to forfeit his $5,000.00 down payment and to allow Air Service to sell the plane No. N9280Q to another is not controlling on the question of ownership of the plane at the time of the crash. Bruce testified that after the crash "there was a great reluctancy to fly by most employees of Knit-Away," and for that reason he met with the President of Air Service in January 1972 and agreed for them to sell the airplane. This evidence confirmed, rather than negatived, the prior ownership in Bruce at the time of the crash.

[7] We hold plaintiffs' evidence sufficient to show a valid contract of insurance in effect at the time of the crash. We now examine defendant's contention that the evidence failed to show that the aircraft which crashed was a "Substitute Aircraft" within the meaning of that contract.

There was evidence that the plane which crashed, N4877J, was the same model and type and of no greater seating capacity than the plane, N9280Q, described in the policy. There was evidence that it was certificated by the Federal Aviation Agency and that it was not owned by the named insured. Thus, from the evidence the jury could find that N4877J was "another fixed wing aircraft" of the type to meet the requirements of paragraph 10 of the policy conditions for being a "Substitute Aircraft." There was evidence from which the jury could find that prior to the crash of N4877J, plane N9280Q had been placed

in "normal use" by the insureds. The policy provided that the purposes for which the plane described therein was to be used was "Industrial Aid," which was defined in the policy as "personal, pleasure, family and business uses, and transportation of executives, employees, guests and customers, excluding any operation for which a charge is made." As heretofore noted, there was evidence that on 7 December 1971 Marshall Parker, an employee of the named insured, Knit-Away, accepted unconditional delivery of N9280Q and flew away in it from the seller's premises at Greensboro. Clearly, that flight alone involved transportation of an employee, one of the uses within the policy definition of "Industrial Aid" use. If the defendant insurance company desired the words "normal use" as contained in paragraph 10 of the policy to have a more restricted meaning than the broad definition of "Industrial Aid" use, which was the stated purpose for which the insured aircraft was to be used as set forth in the policy, then clearly it was incumbent upon the insurance company, which drafted the policy, to make that more restricted meaning clear. It is an established rule of construction that an insurance policy prepared by the insurer is to be construed most liberally in favor of the insured, and in case of ambiguity a construction will not be adopted that will defeat recovery if the policy is susceptible of a meaning that will permit recovery. 43 Am. Jur. 2d, Insurance, § 271, p. 329, et seq.

There was also evidence from which the jury could find that at the time of the crash, the plane N9280Q had been "withdrawn from normal use" because of its "repair" or "servicing" within the meaning of paragraph 10 of the policy. Our Supreme Court stated in Insurance Co. v. Insurance Co., 279 N.C. 240, 182 S.E. 2d 571 (1971), speaking concerning a substitution provision in a policy of automobile liability insurance, that such a provision should be construed liberally in favor of the insured if any construction is necessary and that the terms of such a provision should be given their everyday man-in-the-street understood meaning. The evidence in the present case shows that by 9 December 1971 N9280Q was returned to Air Service so that a radio master switch could be installed and a circuit altered in order to allow a boom mike of a different type than that for which it was originally designed to be operable. These operations constituted "repair" and "servicing" within the everyday man-in-the-street understood meaning of those terms. That these operations had been completed on Friday, 10 December 1971,

and that Richard Austin, an employee of Air Service had checked them out and had notified Marshall Parker on Sunday afternoon, 12 December 1971, that the work had been satisfactorily completed, does not require a holding that the plane N9280Q was, as of the moment of such notification, no longer "withdrawn from normal use." The more reasonable construction of paragraph 10 is that the insureds should have a reasonable period of time after being notified that repair and servicing of their plane had been completed within which to pick it up and that in the meantime the plane which they were using in its place was still being "temporarily used as the substitute for such aircraft" within the meaning of paragraph 10.

We hold that plaintiffs' evidence was sufficient to support a jury finding that at the time the crash of N4877J occurred on the morning of 13 December 1971, it was being temporarily used as a "Substitute Aircraft" for the plane described in the policy within the meaning of paragraph 10 of the policy.

Accordingly, the judgment appealed from which allowed defendant's motion for a directed verdict is

Reversed.

Judges HEDRICK and CLARK concur.