**T. Michael PETERS, Appellant,**

v.

**Ronald F. NORRIS, Appellee.**

No. 14662.

Court of Civil Appeals of Texas.

Houston.

April 7, 1966.

Anderson & Frank, Robert E. Anderson, Houston, for appellant.

Andrews, Kurth, Campbell & Jones, Bass C. Wallace, Houston, for appellee.

WERLEIN, Justice.

This suit was brought by John J. Gallaher and Ronald F. Norris against T. Michael Peters and Truman B. Outland to recover damages for breach of an alleged verbal agreement of sale to Peters and Outland of a Cessna 310C airplane. The consideration was to be a certain amount of cash and the assumption of a purchase money note, secured by a chattel mortgage upon the airplane, held by Medical Center National Bank. The case was tried before the court without a jury, and judgment was rendered in favor of appellee, Ronald F. Norris, in the sum of $13,094.00 together with interest.

In his judgment, the court recited the following findings of fact and law:

"(1) that there was a contract of sale in regard to the Cessna 310C airplane involved in the suit whereby John Gallaher and Ronald F. Norris agreed to sell said airplane to Truman Outland and T. Michael Peters, upon the condition that said purchasers pay the balance due of that certain promissory note dated September 29, 1961 made payable to the Medical Center National Bank, which note was admitted in evidence; (2) that said contract was breached by defendants through their failure to pay said sum; (3) that the title to the airplane in question passed from plaintiffs to defendants prior to the damage occurring

to the airplane; (4) that plaintiff Ronald F. Norris paid to Medical Center National Bank the sum of $5,244.00 on October 15, 1962 and further paid to said Bank the sum of $7,858.66 on April 5, 1965 and that no sums were paid on the promissory note in question by either plaintiff John J. Gallaher, or defendants Truman Outland or T. Michael Peters after May 31, 1962; (5) that there was no contract and no damages as alleged in the 'cross-action' against plaintiff John Gallaher."

■ Appellant asserts that the finding of the court that there was a contract of sale in regard to said airplane was so against the great weight and preponderance of the evidence as to be manifestly unjust and wrong. We have carefully read the statement of facts and examined the exhibits contained therein, and overrule such assignment.

The court's judgment was rendered against Peters and Outland jointly and severally, but only Peters has appealed. Although Peters was present during part of the trial, he failed to testify. Nor is there anything in the record indicating that his deposition was ever taken. Appellee Norris did not enter into any of the negotiations or transactions involving the sale of the airplane in question. Such transactions were handled by Gallaher, who jointly owned the airplane with Norris. Gallaher and Norris had previously purchased the airplane in question and had financed such purchase at the Medical Center National Bank in Houston. They executed on September 29, 1961 a monthly installment promissory note made payable to said bank and also a chattel mortgage on the airplane as security for the payment of said note. They made some three payments on the note before they agreed to sell the airplane to Outland and Peters.

Appellee asserts that negotiations for the sale of the airplane resulted in a contract and agreement of sale thereof to appellant Peters and Outland. Gallaher testified that he delivered possession of the airplane to them in January, 1962, and that thereafter one or two monthly payments on the note were made by Outland and Peters. The evidence shows that in May, 1962, the airplane was damaged while being flown by one Harry Noe with permission from Outland. No further payments were made on the note by Outland or Peters, and Norris was called upon to pay the note on October 15, 1962, and did pay at that time the sum of $5,244.00, and later he paid the balance owing thereon in the amount of $7,858.66, whereupon the note was assigned to him by the bank.

In January, 1962, Outland signed the promissory note at the bank which had been executed by Norris and Gallaher, and Gallaher executed on his behalf and on behalf of Norris, who was his partner in the ownership and operation of the plane, a bill of sale in blank and left it with the president of the bank. The evidence shows that the reason the purchasers of the airplane were not named in the bill of sale was that according to Traylor, the bank president, Outland and Peters "were in the process of either organizing a corporation or buying a corporation. I don't recall exactly. But, they would furnish me the name of the company to which title was to be transferred." The name of the company was never furnished Mr. Traylor despite his oral and written requests for such information, and Outland testified that the proposed corporation was never issued a charter. On August 20, 1962 Mr. Traylor wrote a letter to Peters and Outland stating: "We are holding an application for transfer of title to a Cessna Model 310C aircraft that was purchased by you from Dr. Ronald F. Norris and John J. Gallaher. At the time you purchased the aircraft we were asked by Mr. Outland not to transfer title since you intended to form a corporation and wanted record title to the aircraft placed in this corporation." There is no testimony by Peters that he did not purchase such plane as stated in Mr. Traylor's letter.

Subsequent to the delivery of the airplane to Outland and Peters, they obtained an insurance policy on the airplane in which they both were named as the insureds. Such policy was in effect at the time the airplane was damaged in a crash in Mexico in May, 1962.

Outland testified, "We applied for insurance on the airplane, so as not to let it stand uninsured." Although Outland took care of buying the insurance, the evidence shows that appellant Peters called a friend of his about taking out the insurance coverage. Outland further testified, "I was in Mr. Peters' office when he called him and asked him if he could handle insurance on the airplane." After the accident the insurance company denied coverage on the ground that the plane was not being flown by a properly qualified pilot. Outland testified that before he signed the note at Medical Center National Bank his agreement with Peters was that "He (Peters) would have a two-thirds interest in the airplane and building and I would have a one-third interest." Although Outland testified that there was to be included with the airplane a building and certain equipment, the court found that such was not the case. Indeed, Gallaher testified that the Cessna 310C sale was exclusive of any negotiations with respect to the building or equipment in the building. Outland also testified that either he or Peters could authorize persons to use the airplane, and he admitted that at least one payment to the bank was made after he and Peters took possession of the airplane, and further that he and Peters paid for an overhaul of the airplane engine after it came into their possession which cost in the neighborhood of $1,000.00. He further testified that Peters also made out several checks to him, Outland, which he deposited in the Meyerland State Bank in the Main-Line Air Travel account and that the last two checks, he believed, were at the time they had the engine overhauled.

Shortly after the airplane accident Peters and Outland met with the insurance representatives in Peters' office and discussed with them the insurance claim on the damage to the airplane. Neither Peters nor Outland represented to the insurance representatives that they were not the owners of the airplane, and as stated the insurance was taken out in their names.

The evidence further shows that Gallaher never flew the airplane after its delivery to Outland and Peters, and that he cancelled the insurance policy he had on the airplane when informed of the insurance coverage secured by Outland and Peters. Gallaher testified that he negotiated personally with Peters and Outland and they reached an agreement where "they would buy the airplane, and we agreed upon delivering of the airplane to them, which I did," and that under the terms of the agreement, the buyers would pay off the balance due on the note at the bank. After Gallaher learned of the damage to the airplane, and before the insurance company denied liability under their policy, Gallaher received a telephone call from Peters, in which Peters told Gallaher "that he had put up large portions of money to repair—to overhaul the airplane and to operate the airplane and to purchase it, and that he felt that Outland had treated him badly in their business affairs."

■ It is our view that there was sufficient direct and circumstantial evidence to support the trial court's finding of a contract of sale of the airplane. The fact that Peters spent large sums of money to repair and overhaul the airplane and its engines strongly indicates that he considered that he and Outland had bought the plane. Furthermore, Peters went into details in stating that he had put up large portions of money to repair and overhaul the plane *and to purchase it.* Although Peters never signed the note which Outland had signed, there is nothing in the record to show that he refused to

do so. He was in court and could have testified with respect thereto and could have denied the facts adduced in evidence at the trial by those who did testify if he was not in accord therewith. It is well settled that the existence of an oral contract may be proved by circumstantial evidence as well as by direct evidence. See 13 Tex.Jur.2d, p. 670; Clem v. Forbess, Tex.Civ.App., 10 S.W.2d 223, error dism.; Clower v. Brookman, Tex.Civ.App., 325 S.W.2d 440, and authorities cited therein. In 13 Tex.Jur.2d, at page 298 it is stated:

" . . . it is also a fundamental rule of law that where an oral contract is under consideration, extrinsic evidence is admissible to show the intention of the parties, as reflected by the circumstances that attended the making of the agreement."

See Farmers' Gin Co-Op. Ass'n v. Mitchell, Tex.Civ.App., 233 S.W.2d 948; Pennington Produce Co. v. Browning, Tex.Civ.App., 293 S.W. 935.

In addition to the direct evidence relative to the agreement and the sale, there is strong circumstantial evidence showing that the parties not only intended to enter into a contract of sale but that they understood that they had done so. After the possession of the plane was delivered to Outland and Peters, they exercised control of the airplane and determined who would fly the same. They rented a hanger space for the plane where they kept it. Peters paid for the overhauling of the engines of the airplane, and either Peters or Outland made at least one and possibly two payments at the bank on the installment note. Peters contacted his insurance agent, or friend, and liability and hull insurance coverage was obtained on the plane and the policies were issued to Outland and Peters as the insureds. After the airplane was damaged, Outland and Peters met in Peters' office to negotiate with the insurance representatives in regard to the damage claim, and Peters called Gallaher and told him of the large sums of money he had expended on the repairing, overhauling and purchase of the airplane.

It is true that there is certain testimony by Outland which indicates that a sale was never consummated because Outland was undertaking to obligate only himself and not Peters, and further that Peters did not sign the note as did Outland, and that the building and equipment were not turned over to Peters and Outland. On the other hand, Gallaher testified that he himself directly negotiated the sale with Outland and Peters, and reached the agreement where they would buy the plane, and sign the note at the bank, and he also testified positively that the sale did not include any building or equipment. The evidence also shows that no other instrument was necessary to transfer the title of the plane than the one signed in blank by Gallaher.

After considering all of the evidence, both that substantiating the sale and that militating against it, we have concluded that we cannot say that the findings of the court in respect thereto are so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

■ Appellant contends that the court erred as a matter of law in finding that title to the airplane in question passed to appellant prior to the damage occurring to it. It is appellant's contention that since the Federal Aviation Agency bill of sale was executed in blank by Gallaher and the name of the purchaser was never inserted, any passage of title to appellant must be by operation of law and not by delivery of any document of title. No document was essential to the passage of title as between the sellers and buyers. In 8 Am.Jur.2d, pp. 641–2, Aviation, Sec. 23, it is stated:

"The purpose of the provision requiring the recording of conveyances affecting title to airplanes has been said to be to protect

persons who have dealt on the faith of the recorded title and as to whom it would be a fraud to give effect to unrecorded titles."

As stated in Marsden v. Southern Flight Service, Inc., 1961, 227 F.Supp. 411:

"The Federal Aviation Registration Act makes provision for the recordation of conveyances affecting the title to, or interest in, civil aircraft of the United States, and provides that no such conveyance thereafter made or given shall be valid against any person other than the maker, or his heir or devisee, and any person having actual notice thereof, until so recorded."

See 49 U.S.C.A., Sec. 1403(c); Bishop v. R. S. Evans East Point, Inc., 1949, 80 Ga.App. 324, 56 S.E.2d 134, 136; Marrs v. Barbeau, 1959, 336 Mass. 416, 146 N. E.2d 353; Smith v. Joliet Airmotive, Inc., 1962, 35 Ill.App.2d 2, 181 N.E.2d 817, 819.

Judgment affirmed.