679 F.2d 1264
 34 UCC Rep.Serv. 90
 NORTHWESTERN FLYERS, INC., Debtor, Appellant,
Edward F. Samore, Trustee,
and
Cessna Finance Corporation, a corporation, Appellant,
v.
OLSON BROS. MFG. CO., INC., United States Fire Insurance
Company, Aviation Office of America Incorporated,
Commercial Credit Equipment Corp., All
Foreign Corporations, Appellees.
NORTHWESTERN FLYERS, INC., Debtor, Appellee,
Edward F. Samore, Trustee,
and
Cessna Finance Corporation, a corporation, Appellee,
v.
OLSON BROS. MFG. CO., INC.
United States Fire Insurance Company, Appellant,
Aviation Office of America, Incorporated, Appellant,
Commercial Credit Equipment Corp., All Foreign Corporations.
NORTHWESTERN FLYERS, INC., Debtor, Appellee,
Edward F. Samore, Trustee,
and
Cessna Finance Corporation, a corporation, Appellee,
v.
OLSON BROS. MFG. CO., INC., Appellant,
United States Fire Insurance Company; Aviation Office of
America, Incorporated, Appellees.
Commercial Credit Equipment Corp., All Foreign Corporations.
 Nos. 81-1557, 81-1570 and 81-1614.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 8, 1982.
Decided June 17, 1982.
 
 Steven A. Carter, Sioux City, Iowa, for appellants Northwestern Flyers, Inc. and Cessna Finance Corp.
 Craig A. Raby, Sioux City, Iowa, for appellee Commercial Credit Equipment Co.
 James E. Cooling, Peter T. Tasheff, Martin M. Montemore, Happy, Cooling & Herbers, P. C., Kansas City, Mo., for Olson Bros. Manufacturing Co., appellee/cross appellant.
 William A. Richter, J. Reed Johnston, Jr., St. Louis, Mo., for appellees/cross-appellants, Aviation Office of America and United States Fire Insurance Co.; Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., of counsel.
 Before HEANEY and BRIGHT, Circuit Judges, and HENLEY, Senior Circuit Judge.*
 BRIGHT, Circuit Judge.
 
 
 1
 These controversies arise from the crash and destruction of a new Cessna airplane. At the time of the crash, the buyer, Olson Brothers Manufacturing Company (Olson Brothers), had taken delivery of the airplane but had not fully paid for it. As a result, the seller, Northwestern Flyers, Inc. (Northwestern Flyers), and its financing agent, Cessna Finance Corporation (Cessna Finance), instituted this action against Olson Brothers and its financing agent, Commercial Credit Equipment Company (Commercial Credit) to recover the balance of the purchase price. In addition, Olson Brothers, Northwestern Flyers, and their respective financing agents, filed claims against the Aviation Office of America and the United States Fire Insurance Company (Insurance Company), which had issued two separate insurance policies on the hull of the airplane, one covering Northwestern Flyers and its financing agent, and the other covering Olson Brothers and its financing agent. The Insurance Company refused to pay on either policy. Both Northwestern Flyers and Olson Brothers have been adjudicated bankrupt since the date of the crash.
 
 
 2
 In consolidated actions, the jury returned verdicts for Northwestern Flyers and against Olson Brothers for the unpaid purchase price of the airplane, and for Cessna Finance on its claim under Northwestern Flyers' insurance policy.[1] In addition, the jury returned a verdict for Olson Brothers on its claim based on its separate insurance policy. Following various posttrial motions, the trial court set aside the verdict for Olson Brothers and distributed the proceeds of the policy held by Northwestern Flyers in accordance with its views of the rights of the parties.[2] All parties, with the exception of Commercial Credit, filed appeals or cross-appeals. We reverse and remand, and direct entry of judgments consistent with this opinion.
 
 
 3
 I. Background.
 
 
 4
 Northwestern Flyers, an Iowa corporation, sells and leases small aircraft in Sioux City, Iowa. It served as an authorized Cessna dealer when it sold the airplane to Olson Brothers.
 
 
 5
 On February 10, 1979, Northwestern Flyers entered into a sales agreement with Olson Brothers, a Nebraska corporation, for sale and delivery of a 1979 Cessna Turbo 210 airplane, FAA registration number N6995N, for the sale price of $97,616.49. According to the contract, Olson Brothers agreed to pay $4,600 down and deliver a used Piper airplane, valued at $50,221.49, as a trade-in.[3] Olson Brothers made the downpayment and turned over the used airplane to Northwestern Flyers.
 
 
 6
 On February 16, 1979, Northwestern Flyers obtained the Cessna airplane (N6995N) from Cessna Aircraft Company. To finance its purchase, Northwestern Flyers borrowed $84,037.69 from Cessna Finance Corporation, which retained and perfected a security interest in the airplane.
 
 
 7
 During this time, Northwestern Flyers carried insurance on all its aircraft through a policy with the Aviation Office of America and United States Fire Insurance Company. Northwestern Flyers filed monthly reports with the Insurance Company listing the specific airplanes for which it sought coverage and remitted the premiums for those airplanes. Northwestern Flyers listed the Cessna Turbo 210 (N6995N) on its February report form, and specified policy coverage from February 16, 1979 to February 19, 1979, in the amount of $85,000.[4] The Insurance Company attached to this policy a lienholder's endorsement in favor of Cessna Finance, which entitled Cessna Finance to recover directly for any damage or loss to the airplane.
 
 
 8
 On February 28, 1979, the airplane crashed while on a flight over Montana. The pilot, Larry McAfee, an employee of Olson Brothers, perished in the accident.
 
 
 9
 Following this crash, Northwestern Flyers and Cessna Finance brought this action to recover the unpaid portion of the purchase price from Olson Brothers and the value of the airplane from the Insurance Company.[5] Olson Brothers denied that it owed Northwestern Flyers any amount and asserted a cross-claim against the Insurance Company based on its separate insurance policy.[6]
 
 
 10
 Following a seven-day trial, the court submitted the case to the jury, asking it to determine whether Cessna Finance could recover under Northwestern Flyers' insurance policy,[7] whether Olson Brothers' separate policy entitled it to recovery, and whether Northwestern Flyers should recover from Olson Brothers the balance of the purchase price of the aircraft. The jury returned verdicts for both Cessna Finance and Olson Brothers on their claims under their separate insurance policies. In addition, the jury returned a verdict for Northwestern Flyers on its claim against Olson Brothers under the purchase agreement.
 
 
 11
 Following posttrial motions, the court entered judgment on the verdict for Cessna Finance and against the Insurance Company. The court, however, entered judgment n. o. v. for the Insurance Company on Olson Brothers' claim under its policy, on the theory that Olson Brothers did not have an insurable interest in the airplane at the time of the accident. Finally, while acknowledging Northwestern Flyers' rights against Olson Brothers under the purchase agreement, the court refused to enter judgment on the verdict in favor of Northwestern Flyers and against Olson Brothers for the unpaid purchase price of the Cessna airplane. Moreover, instead of entering judgment for Cessna Finance in the full amount of the insurance policy, the court directed the Insurance Company to deposit with the court $84,000,[8] plus interest from the date of the crash.
 
 
 12
 The court then ordered the clerk of court to distribute this money as follows: $33,778.51, plus interest at the statutory rate from the date of the crash, to Cessna Finance; and $50,221.49, plus interest at the statutory rate from the date of the crash, to Olson Brothers.[9]
 
 
 13
 In addition to the cash award, the court concluded that Cessna Finance should take title to the trade-in airplane.[10] It also ordered Northwestern Flyers to pay Olson Brothers $1,079.51,[11] plus interest from the date of the judgment. Finally, the court ordered the Insurance Company to pay $21,934.95 in attorneys' fees to Olson Brothers.[12]
 
 
 14
 Cessna Finance, Northwestern Flyers, and Olson Brothers appealed the district court's rulings following entry of the judgments. The Insurance Company filed a cross-appeal, contending that neither insurance policy afforded any coverage for the Cessna airplane at the time of the crash.
 
 
 15
 II. Discussion.
 
 
 16
 A. Northwestern Flyers' Hull Policy.
 
 
 17
 Both Cessna Finance and the Insurance Company appeal from the district court's order awarding insurance proceeds to Cessna Finance, as lienholder, under Northwestern Flyers' hull policy. Cessna Finance maintains that the court should have entered judgment in the full amount to which it was entitled under the policy, rather than awarding it title to the trade-in aircraft and $33,778.51 in cash. The Insurance Company contends that Cessna Finance could not recover as a matter of law under Northwestern Flyers' policy because Northwestern Flyers did not have title to the aircraft at the time of the crash.
 
 
 18
 Northwestern Flyers' hull policy contains a lienholder's interest endorsement in favor of Cessna Finance, entitling the lienholder to recover the unpaid balance due on any liens on the aircraft. The "ownership" clause recites the named insured, Northwestern Flyers, as the sole owner of the airplane, and reads as follows:
 
 
 19
 OWNERSHIP: Unless otherwise stated herein and except with respect to bailment, lease, conditional sale, purchase agreement, mortgage or other encumbrance, the Named Insured is the sole owner of the aircraft.
 
 
 20
 The Insurance Company argues that, under the terms of the policy, Northwestern Flyers' coverage ceased after it sold and delivered the aircraft to Olson Brothers. Because Cessna Finance's rights as a lienholder depend upon Northwestern Flyers' rights under the policy, the Insurance Company contends that Cessna Finance cannot prevail unless the lienholder endorsement affords it greater protection than that afforded Northwestern Flyers.
 
 
 21
 The lienholder's endorsement provides that the insurance
 
 
 22
 shall not be invalidated as respects the interest of the Lienholder by any act or neglect of the Insured; except that any change in title of ownership of the aircraft * * * (is) not covered hereunder(.)
 
 
 23
 Cessna Finance, therefore, can recover only if the sale of the airplane to Olson Brothers did not effect a "change in title of ownership." The parties dispute the meaning of this phrase. Cessna Finance claims that the phrase "title of ownership" refers to the paper title to the aircraft. It contends that because Northwestern Flyers retained possession of the bill of sale and the FAA registration, "title" remained in Northwestern Flyers.[13] The Insurance Company argues that the concept of title used in commercial transactions governs the interpretation of the policy. We agree with this latter approach.
 
 
 24
 The phrase "title of ownership" simply refers to lawful ownership of the airplane. Because the parties entered into a commercial relationship, the Iowa Uniform Commercial Code (UCC) governs the rights of the parties.[14] Ordinarily, title to goods passes to the buyer upon delivery. Iowa Code Ann. § 554.2401 (West 1967). Retention of title by the seller in goods delivered to the buyer is limited, in effect, to reservation of a security interest. Id. Thus, upon Northwestern Flyers' delivery of the airplane to Olson Brothers, title to the aircraft passed to Olson Brothers, although Northwestern Flyers may have retained a security interest. See Herington Livestock Auction Co. v. Verschoor, 179 N.W.2d 491 (Iowa 1970); Iowa Code Ann. § 554.2401 (West 1967).[15] Because title to the airplane passed to Olson Brothers upon delivery, Cessna Finance cannot recover as a lienholder under the terms of Northwestern Flyers' policy.
 
 
 25
 B. Olson Brothers' Hull Policy.
 
 
 26
 The jury returned a verdict for Olson Brothers based on its claim under its separate insurance policy, which carried a stated value of $110,000. The district court, however, entered judgment n. o. v. for the Insurance Company on the ground that Olson Brothers did not hold an insurable interest in the airplane at the time of the crash.[16]
 
 
 27
 The Insurance Company concedes that Olson Brothers had an insurable interest in the airplane, and, therefore, admits that the basis for the trial court's ruling was erroneous. It argues, however, that the court properly entered judgment n. o. v. because the pilot's flight pattern, which resulted in the crash, violated the terms of the policy's pilot clause, thereby cancelling Olson Brothers' insurance coverage.
 
 
 28
 Item 7 of the policy declarations provides:
 
 
 29
 PILOT CLAUSE: Only the following pilot or pilots holding valid and effective pilot and medical certificates with ratings as required by the Federal Aviation Administration for the flight involved will operate the aircraft in flight(.) (Emphasis supplied.)
 
 
 30
 The policy specifically excludes from coverage any damage or loss "occurring while the aircraft is operated in flight by other than the pilot or pilots set forth under Item 7 of the Declarations(.)"
 
 
 31
 The parties do not dispute that the policy lists Larry McAfee as a pilot authorized to fly the aircraft, and that he was rated for flight only under Visual Flight Rules (VFR). The parties, however, disagree on whether the fatal flight should be characterized as a VFR flight, for which McAfee carried a proper rating.
 
 
 32
 Prior to takeoff, VFR weather conditions prevailed at Great Falls, Montana, the point of departure, and at McAfee's destination in O'Neill, Nebraska. Although some cloud cover existed in the flight path, Olson Brothers' expert testified that McAfee could have completed the entire flight under VFR conditions. However, seventeen minutes after takeoff, McAfee requested and received permission from the air traffic control center in Salt Lake City, Utah, to fly at altitudes of 21,000 and 23,000 feet. Shortly after climbing to 23,000 feet, McAfee apparently lost control of the airplane and it crashed.
 
 
 33
 Under FAA regulations, Instrument Flight Rules (IFR) govern flight into air space above 18,000 feet.[17] The Insurance Company contends that the flight in question became an IFR flight and that insurance coverage ceased when McAfee flew above that altitude. According to the Insurance Company, the trial judge incorrectly permitted a determination that the flight in question was a VFR flight for which McAfee was properly rated, when he instructed the jury that "a flight (was) to be characterized or determined at the time of take-off."[18] We disagree.
 
 
 34
 At the outset, we note that Nebraska law governs whether McAfee was properly rated for the flight within the terms of the Olson Brothers' policy.[19] We have been unable to find controlling Nebraska precedent to guide our determination of whether the trial court properly instructed the jury that the flight was to be characterized as VFR or IFR at the time of takeoff.[20]
 
 
 35
 The Insurance Company refers to Arnold v. Globe Indemnity Co., 416 F.2d 119 (6th Cir. 1969), and Jim Hawk Chevrolet-Buick, Inc. v. Insurance Co. of North America, 270 N.W.2d 466 (Iowa 1978), as authority for its argument that insurance coverage ceased when McAfee flew into a positive control area without holding an instrument rating. These cases, however, may be distinguished.
 
 
 36
 In Arnold and Jim Hawk, the pilots took off under IFR conditions, while holding only VFR ratings. In Arnold, IFR weather conditions prevailed at takeoff. 416 F.2d at 122. In Jim Hawk, the evidence suggests that IFR conditions existed throughout the entire flight: "(A)t the time of operation and the crash * * * weather conditions were such that the sky was overcast, there was a 600 foot ceiling, it was dark at night, foggy and raining(.)" 270 N.W.2d at 467. Thus, the facts of both Arnold and Jim Hawk differ materially from those in the present case. Here, the flight unmistakably began under VFR conditions.
 
 
 37
 National Insurance Underwriters v. King Craft Custom Products, Inc., 368 F.Supp. 476 (N.D.Ala.1973), aff'd, 488 F.2d 1393 (5th Cir. 1974), and Glover v. National Insurance Underwriters, 545 S.W.2d 755 (Tex.1977), support the district court's instruction that the character of the flight should be determined at takeoff.[21]
 
 
 38
 In King Craft, an insurance carrier denied coverage based on a policy exclusion similar to the one at issue in the instant case. The pilot in King Craft, while holding only a VFR rating, flew into IFR weather conditions and crashed when attempting to land. 368 F.Supp. at 477-78. The insurer argued that the pilot was not properly rated for the flight under the policy's pilot clause. The court noted that, at the time of takeoff, VFR weather conditions prevailed at both the point of departure and destination. Id. at 478. The insurance carrier there, as here, urged the court to break the flight into segments, and to treat that portion of the flight when the crash occurred as an IFR flight for which the pilot did not hold an appropriate rating. The court declined, observing that such an interpretation of the policy "could result in coverage during a particular flight flickering on and off as particular weather conditions were encountered." Id. at 479.
 
 
 39
 The court in Glover similarly confronted the question whether a pilot holding a VFR rating was properly rated for the flight when he encountered IFR weather conditions and crashed. 545 S.W.2d at 758-59. The pilot in Glover began his flight in VFR weather conditions and later encountered IFR weather conditions. The evidence in Glover, however, indicated that at the time of takeoff IFR weather conditions prevailed over the final one-third of the flight as well as the destination. Id. at 759. The court, nevertheless, declined to characterize the flight as an IFR flight. Instead, the court held that a flight must be characterized at its inception. Id. at 762. Because the pilot took off under VFR conditions and VFR conditions prevailed throughout the first one-third of the flight, the court determined the flight to be a VFR flight. Id. at 763.
 
 
 40
 The Insurance Company would distinguish King Craft and Glover from this case on the ground that the pilots in those cases encountered IFR weather conditions. The Insurance Company contends that McAfee did not encounter IFR weather conditions, but simply chose to fly into air space that required an instrument rating.[22]
 
 
 41
 The Insurance Company's contention must be examined in light of the well-settled rule that "exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations upon that coverage in clear and explicit terms." Roach v. Churchman, 431 F.2d 849, 851 (8th Cir. 1970); see also City of Cedar Rapids v. Northwestern National Insurance Co., 304 N.W.2d 228, 230 (Iowa 1981); cf. Neal v. St. Paul Fire & Marine Insurance Co., 197 Neb. 718, 250 N.W.2d 648, 650 (1977) (insurance policy will be liberally construed in favor of the insured).
 
 
 42
 The Insurance Company here knew how to exclude coverage for a flight into air space requiring an instrument rating.[23] It failed to do so in clear and explicit terms in Olson Brothers' policy. In such circumstances, the pilot clause should not be interpreted to exclude coverage as a matter of law. See National Insurance Underwriters v. King Craft Custom Products, Inc., supra, 368 F.Supp. at 479; Glover v. National Insurance Underwriters, supra, 545 S.W.2d at 764.
 
 
 43
 Accordingly, the district court correctly instructed the jury that the flight was to be characterized at the time of takeoff. Because the Insurance Company failed to establish a basis for exclusion of coverage as a matter of law, the jury verdict in favor of Olson Brothers on the hull policy must stand.
 
 
 44
 C. Northwestern Flyers' Claim Against Olson.
 
 
 45
 Although the jury returned a verdict for Northwestern Flyers on its claim for the purchase price of the airplane it had sold Olson Brothers, the district court declined to enter judgment for Northwestern Flyers. Instead, as we have already observed, the court ordered Northwestern Flyers to pay Olson Brothers $1,079.51, the difference between lost profits on the sale of the airplane and the amount Northwestern Flyers had received from Olson Brothers as a downpayment.
 
 
 46
 The jury determined that Northwestern Flyers should recover the unpaid portion of the purchase price from Olson Brothers. The evidence in this case establishes that amount to be $70,473.65: the balance due on the airplane sold, $37,160, plus credit for the $33,313.65 lien Commercial Credit holds on the trade-in airplane, which Olson Brothers represented to be free and clear of liens.[24] Northwestern Flyers should also receive interest on this balance from date of the delivery of the aircraft.
 
 
 47
 D. Olson Brothers' Attorneys' Fees.
 
 
 48
 The district court awarded Olson Brothers attorneys' fees pursuant to Neb.Rev.Stat. § 44-359.[25] Having concluded that Olson Brothers should recover on its claim under its own insurance policy, we affirm the district court's award of $21,934.95 in attorneys' fees. The amount of attorneys' fees awarded falls within the discretion of the district court, Schmer v. Hawkeye-Security Insurance Co., 194 Neb. 94, 230 N.W.2d 216, 218 (1975), and the district court did not abuse that discretion.[26]
 
 
 49
 In addition, because Neb.Rev.Stat. § 44-359 authorizes attorneys' fees for appellate proceedings, Olson Brothers may petition this court for its attorneys' fees on appeal by complying with the rules of this court. See 8th Cir. R. 17.
 
 
 50
 E. Insurance Company's Assertions of Trial Error.
 
 
 51
 The Insurance Company raises several allegations of error in the trial court's evidentiary rulings[27] and jury instructions. We have reviewed those claims, and, in light of our prior rulings, conclude that any error committed must be deemed harmless.
 
 
 52
 III. Conclusion.
 
 
 53
 In sum, we hold that Cessna Finance may not recover under the provisions of Northwestern Flyers' insurance policy for the loss of the airplane. Olson Brothers is entitled to recover the stated value of the airplane under its separate insurance policy along with the amount of attorneys' fees awarded by the district court.[28] Finally, Northwestern Flyers is entitled to recover on its contract claim against Olson Brothers in the amount of $70,473.65, plus interest at Iowa's statutory rate from the date of delivery of the airplane.
 
 
 54
 We affirm in part, reverse in part, and remand to the district court for such further proceedings as may be necessary and for entry of appropriate judgments consistent with this opinion.[29] Olson Brothers shall have costs assessed against the Insurance Company. Northwestern Flyers shall have fifty percent of its costs assessed against Olson Brothers. Otherwise, the parties shall bear their own costs.
 
 
 
 *
 The Honorable J. Smith Henley assumed senior status on June 1, 1982
 
 
 [1]
 Only Cessna Finance pressed a claim under the hull insurance policy issued to Northwestern Flyers. See infra note 7
 
 
 [2]
 As we understand the record, the district court submitted the case to the jury on general verdict forms, reserving the right to determine the amounts to be awarded following return of the verdicts. On appeal the parties primarily contest the court's posttrial rulings
 
 
 [3]
 Olson Brothers entered into an agreement with Commercial Credit to finance the remainder of the purchase price. After the crash, however, Commercial Credit refused to honor its loan commitment
 
 
 [4]
 The four days listed on the report form represent the period during which Northwestern Flyers possessed the aircraft
 Following the crash and after litigation had begun, Northwestern Flyers amended its report form to indicate that coverage on the airplane extended into March 1979. Northwestern Flyers then paid the premiums for this additional period of coverage. This effort was ruled ineffective to confirm coverage as of the time of the crash.
 
 
 [5]
 Northwestern Flyers and Cessna Finance also sued Commercial Credit, Olson Brother's financing agent, on the loan commitment to Olson Brothers. In addition, Olson Brothers filed a cross-claim against Commercial Credit. All claims involving Commercial Credit, including its claim against the Insurance Company, were submitted to the district court. The court determined that none of the parties could recover against Commercial Credit on its loan commitment to Olson Brothers, and that Commercial Credit could not recover against the Insurance Company. None of the parties appealed these rulings
 
 
 [6]
 Prior to trial, the parties stipulated to the following values:
 1) The retail price of the airplane equaled $91,981.49. (This figure represents the purchase price less $5,635 in optional equipment that was never actually installed in the airplane.)
 2) Northwestern Flyers' insurance policy listed the value of the Cessna airplane at $85,000.
 3) The coverage under Olson Brothers' insurance policy totaled $110,000.
 4) Commercial Credit's loan commitment to Olson Brothers equaled $94,025.
 5) The purchase money security interest of Cessna Finance as of the date of the crash was valued at $84,037.69.
 In addition, at the time of trial Commercial Credit held a lien on the used Piper airplane that Olson had traded in on the new airplane in the amount of $33,313.65. The record also indicates that Northwestern Flyers had mortgaged the trade-in airplane to First National Bank of Sioux City, Iowa.
 
 
 [7]
 Before submission of the case to the jury, Northwestern Flyers abandoned its claim under the insurance policy. This action by Northwestern Flyers did not affect the interest of Cessna Finance
 
 
 [8]
 Although Northwestern Flyers' policy carried the Cessna aircraft at a stated value of $85,000, the lienholder's endorsement limited Cessna Finance's recovery to the unpaid balance of the lien it held on the airplane at the time of the crash. The court determined this amount to be $84,000
 
 
 [9]
 Although the court concluded that Olson Brothers was not entitled to recover under its own insurance policy, it, nevertheless, determined that Olson Brothers was entitled to recover $50,221.49, the value of the trade-in Piper airplane, because Northwestern Flyers had never returned that airplane to Olson Brothers
 
 
 [10]
 According to the district court, this distribution would give Cessna Finance the equivalent value of the policy ($84,000)-$33,778.51 in cash, and the trade-in airplane, which it valued at $50,221.49
 
 
 [11]
 The jury found that Olson Brothers was bound to complete its purchase agreement with Northwestern Flyers. The court determined that Northwestern Flyers was entitled to the profit it would have made on the sale of the airplane. It calculated this amount to be $3,520.49. Because Northwestern Flyers had already received $4,600 from Olson Brothers as a downpayment, however, Northwestern Flyers would be required to remit to Olson Brothers the difference of $1,079.51
 
 
 [12]
 The district court explained its ruling as follows:
 The Court finds that (Olson Brothers) is entitled to a recovery of attorneys' fees pursuant to Neb.Rev.Stat. § 44-359 (1978). The reason for this finding is that (Olson Brothers) was forced to litigate when (the Insurance Company) improperly refused to pay (Northwestern Flyers) on its policy of insurance. (The Insurance Company's) refusal to pay resulted in this suit by (Northwestern Flyers) against (the Insurance Company) and (Olson Brothers). If (Olson Brothers) had not become involved in the litigation and cross-claimed against (the Insurance Company), it risked losing the value of the trade-in plane and deposit which it had given to (Northwestern Flyers). Since the court finds that (Olson Brothers) is entitled to recover these amounts, albeit not on their own policy, they have satisfied the requirements of Neb.Rev.Stat. § 44-359. (Northwestern Flyers, Inc. v. Olson Bros. Mfg. Co., No. C 79-4039, slip op. at 9 (N.D.Iowa Apr. 17, 1981).)
 
 
 [13]
 Cessna Finance contends that the federal statute, 49 U.S.C. §§ 1401-1406 (1976 & Supp. III 1979), governing the national registration of aircraft, controls any questions regarding title and necessarily preempts any contrary state law. At the time of the crash, title to the airplane was registered to Northwestern Flyers under this statute. Therefore, Cessna Finance asserts that Northwestern Flyers retained "title of ownership," thus enabling Cessna Finance to recover the insurance proceeds under the lienholder provision of Northwestern Flyers' policy
 The language of the statute, however, indicates that this federal statute does not apply to determinations of ownership. 49 U.S.C. § 1401(f) provides:
 (f) Such certificate shall be conclusive evidence of nationality for international purposes, but not in any proceeding under the laws of the United States. Registration shall not be evidence of ownership of aircraft in any proceeding in which such ownership by a particular person is, or may be, an issue.
 See Norris v. Insurance Co. of North America, 26 N.C.App. 91, 215 S.E.2d 379, 389 (1975); Peters v. Norris, 402 S.W.2d 216, 219-20 (Tex.Civ.App.1966). Therefore, we reject Cessna Finance's contention that questions regarding title of ownership in this action are controlled by federal statute.
 
 
 [14]
 The parties assumed that the UCC governed the question of ownership of the airplane. Each party referred to the provisions of the Iowa UCC in characterizing the sale of the airplane and in supporting its argument concerning change in title of ownership. The district court read to the jury the Iowa UCC provisions governing passage of title, and instructed the jury to apply that law to the facts of the case in determining whether there had been a change in title of ownership in the airplane
 
 
 [15]
 Cessna Finance argues that an explicit agreement could postpone passage of title to the airplane beyond the date of delivery, see Bowman v. American Home Assurance Co., 190 Neb. 810, 213 N.W.2d 446 (1973), and that such an agreement existed in this case
 Some testimony indicates that Northwestern Flyers was to retain the bill of sale and the FAA registration until Olson Brothers made the final payment for the aircraft. In addition, the president of Olson Brothers testified that he believed the airplane to be the property of Northwestern Flyers at the time of the crash. This evidence, however, is insufficient to support a finding that Olson Brothers and Northwestern Flyers had explicitly agreed to postpone passage of title to the aircraft to a time after delivery. Moreover, other evidence supports the view that title passed on delivery in accordance with the provisions of the Iowa UCC. Northwestern Flyers purchased no insurance coverage on the airplane after delivery to Olson Brothers and made delivery without written or express terms of conditional delivery. Although Northwestern Flyers did attempt to purchase insurance coverage up and including the date of the crash after this litigation had begun, see supra note 4, the district court instructed the jury to disregard this attempt by Northwestern Flyers to unilaterally extend the period of coverage under the policy subsequent to the loss of the aircraft.
 Because we have determined that the evidence does not support a finding of an explicit agreement that Northwestern Flyers retained title, we need not decide whether an express agreement under the UCC could postpone passage of title beyond the date of delivery. Compare Bowman v. American Home Assurance Co., supra, 213 N.W.2d at 448 (explicit agreement can prevent passage of title beyond time of delivery) with In re Bosson, 432 F.Supp. 1013, 1020 n.24 (D.Conn.1977) (parties by agreement cannot delay passage of title beyond date of final delivery).
 
 
 [16]
 The district court concluded that the jury's verdict for Cessna Finance on Northwestern Flyers' policy amounted to a finding that Northwestern Flyers held title to the airplane at the time of the crash. From this, the court reasoned that Olson Brothers did not hold title and, therefore, did not have an insurable interest and could not recover under its policy
 
 
 [17]
 FAA regulations designate the air space above 18,000 feet above sea level in the continental United States as a positive control area. 46 Fed.Reg. 747 (1981) (FAA § 71.193). Flight within a positive control area requires the pilot to be instrument rated. 14 C.F.R. § 91.97 (1981)
 
 
 [18]
 The court gave the following instruction regarding the pilot clause:
 Under the provisions of the policy of insurance Olson (Brothers) purchased from the insurance company in this case there was a requirement that a pilot have and possess the rating for the flight involved. You must determine the flight concerning such policy provisions.
 You are instructed that it is the law in the United States that in order for a pilot to operate an aircraft above 18,000 feet (positive control area) the pilot must be instrument rated and on an instrument flight plan.
 You are instructed that a flight is to be characterized or determined at the time of take-off.
 You are instructed that the (Insurance Company) ha(s) the burden of proving by a preponderance of the evidence the following:
 
 
 [1]
 That the flight was to include a climb into the positive control area, and
 
 
 [2]
 The pilot was not rated for the flight involved
 If you find (the Insurance Company) ha(s) proved by a preponderance of the evidence each of the above, you shall find in favor of the (Insurance Company) and against the Olson (Brothers). (Emphasis supplied.)
 
 
 [19]
 This action was instituted in federal district court in Iowa. In determining which state's law governs the interpretation of the terms of the insurance policy, the federal courts must apply Iowa choice of law rules. The Iowa Supreme Court has determined that an insurance policy is governed by the law of the state that the parties intended or by the state with the most significant relationship to the transaction in dispute. Cole v. State Auto. & Casualty Underwriters, 296 N.W.2d 779, 781 (Iowa 1980)
 Although the crash occurred in Montana, the parties entered into the insurance contract in Nebraska and the insured is a Nebraska corporation. We, therefore, conclude that Nebraska has the most significant relationship with the transaction in dispute and that Nebraska law should control any interpretation of the policy provisions.
 
 
 [20]
 The Insurance Company argues that Omaha Sky Divers Parachute Club, Inc. v. Ranger Ins. Co., 189 Neb. 610, 204 N.W.2d 162 (1973), supports its argument that insurance coverage ceased when McAfee flew over 18,000 feet in violation of FAA regulations. Omaha Sky Divers focused upon the pilot's failure to hold a medical certificate as a basis for exclusion of coverage under a similar pilot clause. There the pilot's medical certificate had lapsed before issuance of the policy and prior to the flight in question. Id. at 164. Thus, Omaha Sky Divers may be distinguished on its facts
 
 
 [21]
 The policies at issue in King Craft and Glover contained definitions of flight identical to that in the Olson Brothers' policy. See 368 F.Supp. at 478; 545 S.W.2d at 762. Olson Brothers' policy provided:
 The term "in flight" means the period from the time the aircraft moves forward in taking off or in attempting to take off for air transit, while in the air, and until the aircraft completes its landing and landing run after contact with the land or water.
 
 
 [22]
 The record, of course, does not disclose the reason that the pilot, now deceased, chose to fly at a higher altitude. The record does show that cloud cover existed at altitudes below 18,000 feet
 
 
 [23]
 The policy issued by the Insurance Company to Northwestern Flyers contained the following optional coverage provision:
 This Policy does not apply under Coverages A, B, C, D, E and G to any Insured who operates or permits the aircraft to be operated in violation of United States Federal Air Regulations applicable to aerobatic flight, instrument flight, minimum safe altitude, repairs, alterations, night flight or in violation of any regulation pertaining to pilot certificates. (Exhibit No. 1, Endorsement 1, P 7.)
 
 
 [24]
 No basis exists in this record to require Cessna Finance to take title to the airplane Olson Brothers traded to Northwestern Flyers
 
 
 [25]
 That section provides:
 Policies; actions; attorney's fees. In all cases where the beneficiary, or other person entitled thereto, brings an action upon any type of insurance policy except workmen's compensation insurance, or upon any certificate issued by a fraternal beneficiary association, against any company, person or association doing business in this state, the court, upon rendering judgment against such company, person or association, shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, to be taxed as part of the costs. If such cause is appealed, the appellate court shall likewise allow a reasonable sum as an attorney's fee for the appellate proceedings; Provided, that if the plaintiff shall fail to obtain judgment for more than may have been offered by such company, person or association in accordance with section 25-901, then the plaintiff shall not recover the attorney's fee provided by this section. (Neb.Rev.Stat. § 44-359 (1978).)
 The district court assumed that Neb.Rev.Stat. § 44-359 authorizes the award of attorneys' fees in an action initiated in another jurisdiction. The Insurance Company does not contest that assumption on appeal. Therefore, we have no occasion to address the issue.
 
 
 [26]
 On remand, the district court may determine whether Olson Brothers should recover interest on its attorneys' fees and which state's law governs the award and the rate of such interest
 
 
 [27]
 The Insurance Company argues that the trial court committed reversible error by admitting evidence of a federal regulation which suggested that a VFR flight might be made above 18,000 feet. While the Insurance Company sought to exclude this evidence in a motion in limine, it failed to interpose an objection to this evidence during trial. Therefore, it failed to preserve this alleged error. Collins v. Wayne Corp., 621 F.2d 777, 784 (5th Cir. 1980)
 
 
 [28]
 On remand the district court should determine whether Olson Brothers may recover prejudgment interest on its insurance claim and whether the award of attorneys' fees should bear interest from the date of entry of the district court's judgment
 
 
 [29]
 The question of the assignment of proceeds of the insurance policy by Olson Brothers to Northwestern Flyers, the rights of Cessna Finance as a lienholder, and the competing claims to the proceeds of the judgments that may arise in the bankruptcy proceedings are not before us, although the parties have alluded to these matters in their briefs and at oral argument. Therefore, we do not address the rights of the parties in these matters